T. P. COCHRANE v. INTERSTATE PACKING COMPANY.[1]

March 28, 1918.

No. 20,742.

**Corporation — assessment on stockholders — right to refund passed with transfer of stock.**

The stockholders of defendant, a corporation, at its request, by five written agreements, voluntarily assessed the shares of stock held by them, and paid such assessments into its treasury to restore defendant's impaired capital and credit. The three first agreements provided for a refund out of the corporation's first net profits. The fourth contained no refund provision, but that agreement was made necessary only because through an error the one made a month before was unintentionally too small. By the fifth, or last, agreement, the assessments paid thereunder were to be refunded before any dividends were declared and before any refund on account of prior assessments, but it was not stated that the refund should come out of the first net profits. Plaintiff signed the last agreement only and paid the assessment therein called for; the previous assessments upon the shares of stock now held by him were paid by the then owners. It is *held*:

(1) Plaintiff was entitled to demand and receive a refund whenever the accumulation of the net profits, or surplus, equalled or exceeded the total amounts of all the assessments paid by all the shareowners.

(2) This right of refund passed with the transfer of the shares from the holders thereof who had paid the first four assessments to plaintiff's assignor, and with the transfer from him to plaintiff.

[1] Reported in 167 N. W. 111.

Action in the district court for Winona county to recover $8,100. The facts are stated in the opinion. The case was tried before Granger, J., who made findings and as conclusions of law ordered judgment in favor of plaintiff for the amount demanded. From the judgment entered pursuant to the order for judgment, defendant appealed. Affirmed.

*Briggs, Thygeson & Everall* and *Brown, Abbott & Somsen,* for appellant.

*Webber & Lees,* for respondent.

HOLT, J.

The defendant, a corporation engaged in the business indicated by its name, at the close of the year 1907, found its capital impaired, and all the stockholders signed this instrument, hereinafter referred to as Exhibit A: "We, the undersigned stockholders of the Interstate Packing Co. hereby subscribe to an assessment of ten (10) per cent on the stock held by each of us respectively, to cover the net loss of the company for the year ending September 30th, 1907; which is to be refunded out of the first net profits of the company and from time to time until the whole amount subscribed shall have been refunded. The condition being that all stockholders join in this subscription before becoming effective, after which each one agrees to make payment." The amount subscribed was paid. Towards the end of 1908 the company found that its business had been carried on at a loss during that year, that its line of credit at the banks was exhausted, and that the need of a new building was imperative. To relieve the situation, the stockholders, on October 8, 1908, subscribed two separate instruments, herein called Exhibits B and C, both substantially of the same tenor as Exhibit A, except that the amount of the assessment in each was 5 per cent and that the one, Exhibit C, was made to provide the means for the needed building, and which, after reciting that the amount realized from the assessment should be treated as a surplus and separate account thereof kept, contained this condition:

"The same to be refunded and returned out of the net profits, after the assessments previously made for deficits shall have been made good, as provided for and before any dividends are declared."

A month later an error in the financial statement, upon which the assessment in Exhibit B was based, was discovered. This error had

caused the deficit to appear $7,000 less than it actually. was. The stockholders again came to the rescue, and by a written agreement, herein named Exhibit D, signed by all, subscribed an additional assessment of 5 per cent on their then holdings. This agreement confirmed the two preceding October assessments, and recited that the error mentioned occasioned this additional assessment, but it contained nothing in respect to refundment. These four assessments, amounting to 25 per cent on the shares of stock issued, were all paid in. Defendant kept an account thereof, and its records show these transactions with the stockholders as well as the one now about to be stated. Neither the funds thus obtained from the stockholders nor the $43,700 realized from the issuing of preferred stock in 1909 availed to put defendant on a firm financial footing, or made its business profitable; for, towards the close of 1911, the books showed a deficit of over $29,000. Another assessment of 20 per cent was proposed. The holders of more than one-third of the common stock issued refused to submit to further assessments, but were willing to part with their shares for little or nothing, providing they could be secured against the statutory stockholders' liability. Mr. Jacobson, the president, undertook to acquire and dispose of their shares on the terms stated, the remaining stockholders and those who obtained the stock which Jacobson thus acquired to pay the additional assessment. They so did by subscribing an agreement to that effect. This instrument, herein referred to as Exhibit E, provides that

"The amount of said assessment to be repaid to the subscribers before any of the profits of the company are paid to the holders of any of the other common stock of the company either as dividends or in repayment of any previous assessments; provided, however, that this subscription shall not be effective unless subscribed to by the owners of not less than 75 per cent of the total amount of common stock issued and paid for before the 30th day of November, 1911; and that the written consent to the repayment thereof before any dividends are paid on the common stock, or any other assessments are refunded, be obtained of all stockholders of common stock not signing this agreement."

All the then stockholders but one signed Exhibit E, and he executed his consent to the refundment provision.

Beginning with 1912 the business of defendant prospered so that when

this action was begun the $29,000 deficit of 1911 was wiped out, and a surplus of undivided profits exceeding $50,000 had been created, which surplus had reached nearly $70,000 at the time of trial. The total payments under the several subscription assessments amount to $42,415. Of the shares of stock which Jacobson acquired under the above mentioned arrangement of 1911, plaintiff now holds 180, one Mergens 100, and Jacobson the balance. Plaintiff was secretary and treasurer from the time he became interested in the corporation, early in 1912, until September 30, 1916, when dissensions arose which led to a change in the officers whereby plaintiff lost his position.

He then demanded the repayment of the 45 per cent paid in upon the stock held by him, amounting to $8,100. Of this he had personally paid the last assessment in the sum of $3,600, and $4,500 had been paid by former owners of that stock. The demand was refused; and this action to recover the amount was instituted. The answer raised the defense that the surplus was needed to run the business advantageously, and so long as no dividends had been declared the time for the refundment of these voluntary assessments rested in the discretion of the board of directors. In short, there was nothing yet due. And as a further defense it was alleged that, under an agreement existing between plaintiff and Jacobson, all refundments, including the 20 per cent assessment paid in by plaintiff, should be made to Jacobson. There was no substantial dispute as to the facts hereinbefore recited, and as found by the court, except as to the last mentioned defense, and, upon ample evidence, the court found that no such agreement as to refundment was made with Jacobson. Judgment was entered pursuant to the findings against defendant for $8,100, the total amount paid in by the holders of the 180 shares of stock now owned by plaintiff. Defendant appeals.

Very likely the best interests of all concerned would be subserved by postponing the refundment of these assessments to a more opportune time. Present prices of labor and material necessitate a much larger working capital for a plant of this kind than formerly. But courts may not decline to enforce a plain contract right demanded by a litigant, even though convinced that a refusal would be for his best interest as well as for that of his adversary. Whether plaintiff is entitled to the refund now must, therefore, be determined from the contracts themselves.

In so doing it is both proper and necessary to consider the effect of Exhibit E upon the stipulations contained in the preceding contracts.

Defendant's position is, in short, that those who signed and performed Exhibit A, as well as those who acquired stock from them, by executing Exhibit E made the specific and certain refundment condition of Exhibit A entirely nugatory; therefore, since the assessment under Exhibit E is to be refunded before that paid under Exhibit A can be demanded, and since no definite time for refundment is' mentioned in Exhibit E, other than it is to be made before any profits are distributed to the holders of common stock, either as dividends or in repayment of any previous assessments, the entire refundment proposition is necessarily left to the control of the board of directors. We cannot assent to this construction of the contracts involved.

The four previous assessment agreements were clearly in mind of the parties when the fifth, and last, was prepared and executed. All the assessments had the same purpose in view, to tide over the financial troubles of defendant, and when that was accomplished to restore to the stockholders the temporary addition they had made to the shares of capital stock held by them. Exhibit E should therefore be construed in connection with Exhibit A. So doing, we do not think there was any intention to change or modify the terms of Exhibit A as to the right to a refund from the first net profits, except to the extent that there must be an accumulation of net profits or surplus to an amount sufficient to refund all the intervening assessments to which the right of refund existed, before the right to any refund whatever accrued. This plainly holds good as to Exhibits B and C as well as to Exhibit A. When the time arrived that the net profits were more than adequate to return all the assessments paid in there would seem to be a clear right for any one entitled to participate in the refund to demand and receive it.

We do not consider that the omission to provide for refundment of the amount paid in under Exhibit D precludes a recovery thereof. That agreement was necessitated by the error above referred to, and was made in order to fully accomplish what the error partially prevented the assessment under Exhibit B from accomplishing, viz., wipe out the deficit. No shares of stock had in the meantime changed ownership. All the doings of defendant and its officers in relation to raising funds by this

valuntary assessment of the stockholders imply a promise to repay. Corporations, like individuals, may be held upon an implied promise. Deane v. Hodge, 35 Minn. 146, 27 N. W. 917, 59 Am. Rep. 321; Rogers v. Hastings & Dakota Ry. Co. 22 Minn. 25.

The next contention is that the amounts paid into the treasury of the defendant under the various agreements became personal loans from the individuals who paid, and did not attach to the shares of stock held by those who made the payment so as to follow a subsequent transfer of the shares. Therefore, it is claimed, in no event is plaintiff entitled to any refund on the first four assessments paid by the prior owners of the 180 shares he now holds. We doubt the merit of the claim. The intention of those prior owners seems to have been to part with all interest in defendant and its business upon securing a release or protection against statutory liability incurred from having been shareowners. But, be that as it may, that defense, in all fairness, should not now be open to defendant. In its answer it specifically alleges that Jacobson, who procured from those who paid the first four assessments these 180 shares of stock which plaintiff now holds, is entitled to whatever refund there may be coming, because of an agreement made between Jacobson and plaintiff to that effect. Defendant thereby concedes that the right to the refund passed with the shares of stock into Jacobson's hands when he procured them, and remained with him when the shares were transferred to plaintiff only because of the alleged agreement. The former owners are not here to complain, nor does defendant seem apprehensive that they ever will for it has not seen fit to have them interplead.

Indeed, on the merits, we think the right to refund, under these contracts, passed with a transfer of the shares of stock. It appears from a consideration of the method pursued by defendant, its officers and stockholders, with respect to these voluntary assessments, that the amounts paid thereunder were not regarded as loans from the individuals, but as contributions to defendant's capital by restoring the value of the shares of the issued stock to par, pending the accumulation of an anticipated surplus from net profits. The assessments became a surplus fund for defendant's use. The agreement on the part of defendant was to create out of the first net profits an equivalent surplus fund to be distributed, when so doing would still leave the value of the outstanding

shares at par. The first three assessment agreements speak of refundment from the net profits. Exhibit C treats the assessment paid in as a "surplus fund." The net profits of a corporation go to make up its surplus. It denotes what remains after defraying every expense, including loans falling due as well as interest on such loans. Mobile & O. R. Co. v. Tennessee Co. 153 U. S. 486, 14 Sup. Ct. 968, 38 L. ed. 793. Profits are the surplus earnings available for the payment of dividends. Williams v. Western Union Tel. Co. 93 N. Y. 162; Park v. Grant Locomotive Works, 40 N. J. Eq. 114, 3 Atl. 162. The net profits, or surplus, of a corporation belong to its shareholders, when it is to be distributed either under the authority of the local board of directors or, as here, pursuant to the terms of a contract the distribution would naturally be to the then shareowners. This leads to the conclusion that all concerned intended that a transfer of the shares of stock transferred also the right to participate in the refund of the assessments paid upon such shares. We find no legal principle opposed to this conclusion, and regard it supported not only by a consideration of the assessment agreements but by the position taken by the defendant in its answer, by Jacobson on the witness stand, and by the contracts in evidence through which Jacobson procured the stock under the 1911 arrangement, particularly the Knauff shares.

The judgment is affirmed.